**NITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. GARY S. KATZMANN**

--------------------------------------------------------------------- X

ETEROS TECHNOLOGIES USA, INC.        :

        :

       **Plaintiff,**        :

        :

       *v.*        :        **No. 21-cv-00287**

        :

UNITED STATES,        :

        :

       **Defendant.**        :

--------------------------------------------------------------------- X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

NEVILLE PETERSON LLP

Richard F. O'Neill
701 Fifth Ave. Ste. 4200-2159
Seattle, WA 98104
(206) 518-9335
roneill@npwny.com

John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  September 10, 2021

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

STATEMENT OF FACTS .................................................................................................. 2

I.      Plaintiff Eteros Technologies USA, Inc. .............................................................. 2

II.     Subject Entry and Subject Merchandise. .............................................................. 2

III.    CBP's CF 28 Requests for Information and Eteros' Responses............................. 4

IV.     CBP's May 10, 2021 Exclusion Determination.................................................... 8

V.      Deemed Denial of Eteros' Protest By Operation of Law. .................................... 9

STANDARD OF REVIEW ................................................................................................ 10

ANALYSIS.......................................................................................................................... 10

I.      The Federal Authorization Exemption of 21 U.S.C. § 863(f)(1) is Plain and
        Unambiguous and Must Be Applied According to its Terms............................... 11

        A.      The Entirety of Section 863's Prohibitions "Shall Not Apply" When
                Subsection (f)(1) Authorization Exists. ................................................... 19

        B.      The Authorization Exemption Links Admissibility of Plaintiff's Merchandise
                to Authorizations Provided by *Inter Alia* State Laws. ........................... 20

        C.      CBP Lacks Authority to Exclude the Subject Merchandise. ................... 24

                1.      The Subject Merchandise Meets the Federal Definition of "Drug
                        Paraphernalia"............................................................................... 24

                2.      Plaintiff is a "Person" as Envisioned by 21 U.S.C. § 863(f). .... 25

                3.      Plaintiff is Authorized by State Law to Possess, Distribute or
                        Manufacture the Subject Merchandise....................................... 27

CONCLUSION.................................................................................................................... 29

## TABLE OF AUTHORITIES

**Cases**

*Akebia Therapeutics, Inc. v. Azar,* 976 F.3d 86 (1st Cir. 2020) ...................................................... 18

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787 (2015) ........................... 16

*Bailey v. United States*, 516 U.S. 137 (1995) ............................................................................... 18

*Bond v. United States*, 564 U.S. 211 (2011) ................................................................................. 16

*Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014).......................................................... 26

*Citizens United v. Federal Election Commission,* 558 U.S. 310 (2010) ...................................... 25

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249 (1992) ...................................................... 11, 13

*Dodd v. United States*, 545 U.S. 353 (2005)................................................................................. 11

*Forest Labs., Inc. v. United States*, 476 F.3d 877 (Fed. Cir. 2007) ............................................. 10

*GATX Leasing Corp. v. Nat'l Union Fire Ins.* Co., 64 F.3d 1112 (7th Cir. 1995) ...................... 10

*Gregory v. Ashcroft*, 501 U.S. 452 (1991).................................................................................... 16

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1 (2000).................... 11

*Herbert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74 (5th Cir. 1990) .................... 10

*New State Ice Co. v. Liebmann*, 285 U.S. 262 (1932) .................................................................. 15

*NZ Lamb Co. v. United States,* 40 F.3d 377 (Fed. Cir. 1994)...................................................... 10

*Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513 (1994) .................................................. 22

*Tyler v. Cain*, 533 U.S. 656 (2001)............................................................................................... 11

*United States v. Mishra*, 979 F.2d 301 (3d Cir. 1992)................................................................. 21

*Universal Steel Prods. v. United States,* 495 F. Supp. 3d 1336 (Ct. Int'l Trade 2021) .............. 10

**Federal Statutes**

1 U.S.C. § 1................................................................................................................................... 25

7 U.S.C. § 1639o............................................................................................................................. 6

19 U.S.C. § 1514............................................................................................................................. 8

19 U.S.C. § 1595a .................................................................................................................. passim

28 U.S.C. § 1581 ....................................................................................................................... 9, 10

42 U.S.C § 2000bb ........................................................................................................................ 26

Controlled Substances Act, 21 U.S.C. §§ 801 *et seq.* ................................................................. 12

Mail Order Drug Paraphernalia Control Act, 21 U.S.C. § 863............................................ passim

**Federal Regulations**

19 C.F.R. § 1499 ............................................................................................................................. 9

19 C.F.R. § 151.16 ............................................................................................................... 8, 19, 21

19 C.F.R. § 174.21 ........................................................................................................................... 9

19 C.F.R. § 177.9 .......................................................................................................................... 14

**State Statutes and Regulations**

1 Colo. Admin. Code § 212-2.102-1401....................................................................................... 17

2004 Medical Marijuana Act, 2011 Mt. SB 423 .......................................................................... 17

Alaska Stat. 17.37.010-.37.070..................................................................................................... 16

Ariz. Rev. Stat. 13-3412.01 .......................................................................................................... 16

Cal. Health and Safety Code 11362.5 .......................................................................................... 16

Colo. Const. art. XVIII, § 16 .................................................................................................. 16, 17

Colo. Rev. Stat. § 42-4-1301 ........................................................................................................ 17

Colo. Rev. Stat. §§ 12-43.4-101-1101 ......................................................................................... 17

Colo. Rev. Stat.§§ 18-3-106, 18-3-205 .................................................................. 17
Haw. Rev. Stat. §§ 329-121-128........................................................................... 17
Me. Rev. Stat. Ann. Tit. 15, 5821-A ....................................................................... 16
Nev. Const., Art. 4, § 38 ........................................................................................ 16
Nev. Rev. Stat. § 0.039 .......................................................................................... 27
Nev. Rev. Stat. §§ 453A.010-453A.810 ................................................................. 17
Or. Rev. Stat. 475.300-.346 ................................................................................... 16
Wash. Admin. Code § 314-55 .......................................................................... 17, 29
Wash. Rev. Code Ann. § 1.16................................................................................. 27
Wash. Rev. Code Ann. § 46.04......................................................................... 17, 29
Wash. Rev. Code Ann. § 46.20......................................................................... 17, 29
Wash. Rev. Code Ann. § 46.61............................................................................... 17
Wash. Rev. Code Ann. § 69.50............................................................................... 29
Wash. Rev. Code Ann. Ch. 69.51A ....................................................................... 16

## Other Authorities

131 Cong. Rec. 5932·(Mar. 20, 1985) (Remarks of Rep. Levine) ............................. 22
141 Cong. Rec. E1374-01 (daily ed. June 30, 1995) (statement of Rep. Solomon).................... 16
141 Cong. Rec. E2365 (daily ed. Dec. 14, 1995) (statement of Rep. Frank) .............................. 16
143 Cong. Rec. E194 (daily ed. Feb. 10, 1997) (statement of Rep. Frank)................................ 16
2A N. Singer, Statutes and Statutory Construction § 46.06 (rev. 6th ed. 2000).......................... 18
CBP Headquarters Ruling H306125 (August 5, 2020)........................................................ passim
Jerome P. Kassirer, M.D., *Federal Foolishness and Marijuana*, New England Journal of
   Medicine, 336 New Eng. J. Med. 366 (1977) ................................................................. 16
Marijuana Freedom and Opportunity Act, S. 1552, 116th Cong. (2019) ...................................... 12
Model Drug Paraphernalia Act, Drug Enforcement Agency (1979) .................................... 21, 22
MORE Act, H.R. 3884, 116th Cong. (2019) ......................................................................... 12
Nguyen, Jeremiah, *States Projected to Post Higher Marijuana Revenues in 2021*, the Tax
   Foundation (August 3, 2021) ........................................................................................ 17
Office of the Law Revision Counsel, United States Code: Detailed Guide to the United
   States Code Content and Features ................................................................................ 20
SAFE Banking Act of 2021, H.R. 1996, 117th Cong. (2021) ..................................................... 12
Staff of H. Select Comm. on Narcotics Abuse & Control, 96th Cong., Rep. on Drug
   Paraphernalia (Comm. Print 1980) ............................................................................... 21
*State Medical Marijuana Laws,* National Conference of States Legislatures (Aug. 23,
   2021) ........................................................................................................................... 17
U.S. Const. amend. X................................................................................................................. 15
U.S. Dep't of Justice, Drug Paraphernalia: Federal Prosecution Manual (1991)................. 21, 22

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. GARY S. KATZMANN**
-------------------------------------------------------------------X
ETEROS TECHNOLOGIES USA, INC.                      :
                                                   :
        Plaintiff,                                    :
                                                   :
        *v.*                                          :       **No. 21-cv-00287**
                                                   :
UNITED STATES,                                     :
                                                   :
        Defendant.                                    :
-------------------------------------------------------------------X

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS

In accordance with Rule 12(c) of the Rules of the U.S. Court of International Trade ("USCIT R."), Plaintiff, Eteros Technologies USA, Inc. ("Eteros"), respectfully submits this Memorandum in Support of its Motion for Judgment on the Pleadings, seeking the relief sought in the Complaint.

This case involves United States Customs and Border Protection (CBP)'s deemed denial of Plaintiff's protest against the exclusion from entry into the United States, at the port of Blaine, Washington, of certain motor frame assemblies (the "Subject Merchandise"). Following importation, the Subject Merchandise was to be assembled with other parts to create an item known as the "Mobius M108S Trimmer," an agricultural machine used primarily in the harvesting of cannabis products.

There are no material facts in dispute. For purposes of this case, Plaintiff stipulates that the Subject Merchandise meets the federal statutory definition of "drug paraphernalia." *See* Mail Order Drug Paraphernalia Control Act of 1986, Pub. L. 99-570, 100 Stat. 3207-51, 21 U.S.C. § 863(d). Plaintiff further stipulates that the Subject Merchandise is not traditionally intended for use with tobacco products. *See* 21 U.S.C. § 863(f)(2). Having stipulated that the Subject Merchandise is

"drug paraphernalia," Plaintiff submits that it is nonetheless exempt from the federal prohibition against importing "drug paraphernalia," 21 U.S.C. § 863(a)(3), because:

   (i)   the federal authorization exemption, 21 U.S.C. § 863(f)(1)—which demands consideration of "state, local and federal authorizations of the manufacture, possession, and/or distribution of "drug paraphernalia"—clearly applies; and

   (ii)  the relevant State law authorizes the Plaintiff to manufacture, possess and distribute cannabis paraphernalia.

Because Plaintiff satisfies the Congressionally-prescribed authorization exemption in 21 U.S.C. § 863(f)(1), which explicitly requires consideration of State and local authorization regimes, its merchandise may not lawfully be excluded from the United States as unlawful "drug paraphernalia."

CBP's refusal to apply the law as Congress intended cannot stand. The Court should grant Plaintiff's Motion and enter judgment on the pleadings in its favor, directing CBP to allow the merchandise at bar to be imported into the United States pursuant to the federal authorization exemption of 21 U.S.C. § 863(f)(1), and according to the authorizations of applicable State law.

## STATEMENT OF FACTS

### I.   Plaintiff Eteros Technologies USA, Inc.

Eteros is a Washington State corporation engaged in the importation, manufacture, and distribution of agricultural machinery for the cannabis (hemp and marijuana) processing industry. Eteros' customers are primarily processors of hemp, which is legal under Federal law. Additionally, Eteros distributes its merchandise to State-licensed harvesters of legal marijuana whose use of the merchandise is subject to stringent State authorization and licensing systems.

### II.   Subject Entry and Subject Merchandise.

Eteros imported the Subject Merchandise, consisting of certain motor frame assemblies to be used to manufacture the Mobius M108S Trimmer, an agricultural machine, into the United

States at the Port of Blaine, Washington, under cover of Consumption Entry No. 551-5878880-8, on or around April 10, 2021. The merchandise was presented to CBP for examination on or around April 10, 2021. CBP issued a Notice of Detention on April 10, 2021. *See* Memorandum in Support of Eteros' Protest (dated May 11, 2021) ("Eteros' Protest Memo"), Complaint Exhibit ("Compl. Ex.") A, Notice of Detention and Custody Receipt for Detained Property (April 10, 2021), at Protest Ex. A.

The Subject Merchandise is depicted at Complaint ¶ 7.

The Mobius M108S Trimmer is designed to separate the leaf from the flower of cannabis or other plant material. The machine is depicted at Complaint ¶ 8. *See e.g.,* Eteros' Protest Memo, Compl. Ex. A, Mobius M108S Manual, Protest Ex. C (*see id*. at 9 for a parts diagram of the Mobius M108S); *see also*, Eteros' Protest Memo, Compl. Ex. A, at 3-5 (description of product).

Operation of the Mobius M108S begins with the insertion of cut and untrimmed agricultural materials into the infeed machine opening. The materials enter a cylindrical tumbler—known as the AirThread Tension Tumbler—which is enclosed safely within a fold down lid. The consistent gaps between the tumbler and blades make for a consistent, tightly trimmed end-product (0.25-inch gaps for maximum cutting blade access), which enables a faster trim time (product spends less time in the tumbler), less surface area to collect resin (reducing cleaning time and precious resin loss), and a closer trim. The Mobius M108S is equipped with three self-sharpening blade cartridges. Each cartridge consists of a surgical-grade stainless steel bed knife flexed against a case-hardened helical blade with constant, gap-free contact to create a shearing cut identical to scissors. Three 36-inch (91 cm) blade cartridges set side-by-side offer 108-inches (274 cm) of trim opportunity with each pass of the tumbler. Materials are trimmed faster and spend less time in the tumbler, minimizing the risk of impact damage. Each TriFlex blade cartridge is custom made using

3

proprietary tooling. Helical blades are nitrided to harden their surface and black-oxidized to prevent rusting. Cartridges are held in place by tension. The tumbler and blade cartridges are depicted at Complaint ¶ 9 (citing Mobius M108S Manual, Protest Ex. C at 9).

A fan beneath the tumbler and blades creates air flow, drawing air in from the top and creating a vacuum that pulls inserted agricultural materials through the gaps and into contact with the three cutting blades. The Mobius M108S has an integrated separation system, whereby both the trim separator and vacuum are built directly into the body of the M108S, reducing the machine's footprint. As agricultural material moves through the machine, leaf and stem material ("trim material") is sucked through the tumbler gaps where it is cut by the blades. Viable trim material is then sucked into the separator compartment at the back of the machine, and finished agricultural material exits the machine through the outfeed opening.

## III.    CBP's CF 28 Requests for Information and Eteros' Responses.

On April 16, 2021, CBP issued a CF 28 Request for Information to Eteros inquiring about the Subject Merchandise, its manufacture and intended end-use, whether it would be assembled/combined with other articles/materials, and requesting product instructions and other materials. On April 19, 2021, Eteros accurately responded that the Mobius M108S yields two end-products at the conclusion of processing: (i) cannabis flower which has had all leaf and stem material removed; and (ii) the "trim" consisting of leaf and stem material. It explained further that the input product is plant material that has been removed from the stalk of the plant, noting that "The Mobius M108S can also be used on any agricultural material that has a dense portion larger than 0.25" diameter, and a protruding portion smaller than 0.25" that is required to be removed and separated, (examples include hops, grapes, various flowers, herbs, etc)." Eteros also explained the history of its entry into the U.S. market, stating:

The Mobius M108S was designed in Canada in 2016. Eteros' initial target market was large, Canadian, federally licensed producers of cannabis. The company made a conscious decision not to sell into the US market, because at that time, all forms and variants of the cannabis plant were federally illegal in the United States. After the Agricultural Improvement Act of 2018 was signed into law in December 2018, Eteros saw an opportunity to provide its equipment to a newly legal, emerging market in the US, namely low THC, high CBD cannabis production (legalized and defined as "hemp" in the Agricultural Improvement Act of 2018). We knew our machinery would be an ideal fit for the processing needs of America's emerging hemp farmers. Eteros began selling equipment into the US market in 2019, and it was apparent that the need for quality, commercial-scale cannabis processing machinery was growing quickly (*see*: https://hempindustrydaily.com/wp-content/uploads/2020/08/hemp-harvest-2020_FINAL.pdf ).

*See* Eteros' Protest Memo, Compl. Ex. A, CBP CF28 of April 16, 2021, and Eteros' Response of

April 19, 2021, Protest Ex. D (enclosures not included).

On April 27, 2021, CBP issued a second CF 28 Request for Information asking whether the Subject Merchandise will "be used at any point, in any way, to manufacture, produce, or process a product that has a [THC] concentration over 0.3 percent?" Eteros responded accurately as follows:

In our responses of April 19, we explained that the items entered in Entry Number 55158788808 will be assembled with other materials to create an ultimate end item known as the Mobius M108S. Eteros did not bring its products to market in the U.S. until after the Agricultural Improvement Act of 2018—which legalized "hemp"—was signed into law. Eteros obtained a Hemp Processing License so that it can demonstrate the primary intended use of the Mobius M108S in processing hemp to prospective US-based customers.

CBP now asks whether the articles will be used with any cannabis material with a THC concentration over 0.3 percent. As described in our initial responses, any plant material that has a dense flower structure with a protruding leaf could be used with the device. More specifically, the Mobius M108S effectively processes any agricultural material that has a dense portion larger than 0.25" diameter, and a protruding portion smaller than 0.25" that is required to be removed and separated. Notably, the physical structure of cannabis plant material does not meaningfully change according to the THC content of any given cannabis plant or harvest. As the input allowances for the Mobius M108S permit the insertion of cannabis, an end user could insert plant materials that have a THC content exceeding the 0.3 percent threshold. Accordingly, while the machine is capable of use with cannabis

5

exceeding the 0.3 percent threshold, this is not the primary intended use of the machine in the USA.

*See* Eteros' Protest Memo, Compl. Ex. A, CBP CF28 of April 27, 2021, and Eteros' Response of April 29, 2021, Protest Ex. E. CBP asked *inter alia* why Eteros believes the imported article is authorized under Federal law to enter the United States. Eteros responded (*id.*):

> Eteros' refers to its response to CF 28 question 2. By way of supplementation, we respectfully urge CBP to appreciate our limitations in responding to this inquiry. We are not trying to evade CBP's questions, which we interpret as seeking to learn whether the merchandise meets the 21 U.S.C. § 863(d) definition of "drug paraphernalia," however, we simply lack access to end-user records. The Mobius M108S device does not detect and report to Eteros the THC content of cannabis material processed by end-users. Eteros cannot prevent users from feeding appropriately sized agricultural material of any kind into the machine for processing. Likewise, Eteros has no access to, nor authority to demand, its customer's processing records.

> We reiterate that the User Manual for the M108S demonstrates that Eteros' customers and end-users are only authorized to use the equipment on legal plant matter (see Mobius M108S Manual.pdf, page 5).

> In any case, as explained in response to CF28 question 2, below, we are advised that our merchandise is not subject to the import prohibitions of 21 U.S.C. § 863(a)(3) for at least two reasons: (i) as explained above, the primary intended use of the Mobius M108S in the USA is with "hemp"; and (ii) the Mobius M108S meets the statutory authorization exemption of 21 U.S.C. § 863(f)(1).

> First, any equipment, product, or material of any kind which is primarily intended or designed for use with "hemp" is not "drug paraphernalia" under 21 U.S.C. § 863(d) because "hemp" is not a controlled substance. *See* 21 U.S.C. § 802(16)(B) ("marihuana does not include … hemp, as defined in section 1639o of title 7"); 7 U.S.C. § 1639o(1) (defining "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol ["THC"] concentration of not more than 0.3 percent on a dry weight basis.").

> Second, the operation of the Mail Order Drug Paraphernalia Control Act of 1986 ("Paraphernalia Control Act ") (codified at 21 U.S.C. § 863) is inapplicable where a State has enacted laws legalizing the use, possession, and distribution of marijuana. The federal authorization exemption, 21 U.S.C. § 863(f)(1), makes clear that CBP has no authority to seize (or exclude, by refusing to make an admissibility determination) imported "drug paraphernalia," as defined under § 863(d), as an

importation "contrary to law" under 19 U.S.C. § 1595a(c), or according to the seizure provisions of § 863(c), when state law authorizes the manufacture, possession, or distribution of such goods.

The Paraphernalia Control Act makes it "unlawful for any person to, among other things, "import or export drug paraphernalia." *See* 21 U.S.C. § 863(a)(3). The Paraphernalia Control Act makes unlawful certain paraphernalia-related activities set forth in § 863(a), but this prohibition is not absolute. The statutory authorization exemption of the Paraphernalia Control Act at § 863(f)(1) requires CBP's consideration of local, state, and/or federal authorizations:

> (f) Exemptions. This **section** shall not apply to—
>
> (1) any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items.

The § 863(f)(1) exemption removes all prohibitions on "drug paraphernalia" included in "the section"—*i.e.*, the entirety of 21 U.S.C § 863, including the import prohibition of § 863(a)(d)—for those authorized by local, state, or federal law to manufacture, possess, or distribute "drug paraphernalia." Thus, even if Eteros' Mobius M108S were only used with marijuana, its importation into Washington State would not be subject to the import prohibitions of § 863(a)(3).

Nearly every state has legalized marijuana in one form or another. This includes Washington State (where the goods were imported) which legalized the recreational use of marijuana in 2012 when its citizens voted to pass Initiative 502 ("I-502"), see 2013 Wash. Laws. ch. 3, § 20(3). The Washington State Liquor and Cannabis Board ("WSLCB") regulates Washington's cannabis market, creating and enforcing rules regarding marijuana. Per the Revised Code of Washington ("RCW"), a person in the State of Washington violates the drug paraphernalia laws if they use, deliver, or possess any "equipment, products, [or] materials of any kind" to "plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body **a controlled substance other than marijuana**." RCW 69.50.412; *see also* WAC 314-55-010 (excluding from the definition of "paraphernalia" all "items for **growing**, **cultivating**, and **processing marijuana**[.]"). Accordingly, under Washington State law, the possession, manufacture, or distribution of marijuana-related "equipment, products, and materials of any kind" is authorized.

The federal laws clearly empower States to enact laws that take advantage of the 21 U.S.C. § 863(f)(1) authorization exemption so that those doing lawful business under the laws of a relevant State can be shielded from the consequences that may otherwise attach under the Paraphernalia Control Act.

As demonstrated, Washington State laws concerning cannabis paraphernalia affirmatively authorize conduct otherwise prohibited by the federal Paraphernalia Control Act, which means that federally prohibited paraphernalia activities are deemed "lawful" and exempt from the Paraphernalia Control Act's prohibitions— including the federal prohibition on importation contained at 21 U.S.C. § 863(a)(3), and the attaching consequences, including seizure and forfeiture under § 863(c). Importations of goods satisfying the § 863(d) definition of "drug paraphernalia" are exempt from the federal prohibition when imported into Washington State. By extension, there can be no claim that Eteros has made an importation "contrary to law" under 19 U.S.C. § 1595a(c).

## IV.     CBP's May 10, 2021 Exclusion Determination.

By email of May 10, 2021, CBP wrote to Eteros stating "[a]ttached is a letter to inform you that the merchandise on Entry 551/587888808, detained at the Blaine port-of entry on April 10, 2021, is being excluded," and issued to Eteros a Notice of Exclusion (May 10, 2021), Eteros' Protest Memo, Compl. Ex. A, at Protest Ex. F. In the Notice of Exclusion, CBP stated that it:

> … has determined that the merchandise under Entry 551/58788808 is drug paraphernalia, as defined under 21 U.S.C. § 863(d). In your response, you reference 'legalized hemp' and state that the primary intended use of the Mobius M108S, is for processing hemp. In the User Guide, however, your product is advertised as 'the world's best cannabis and hemp trimmer.' To this end, it appears the primary use is not just for legalized hemp, but for a product identified under the Controlled Substances Act.

*Id.* CBP also rejected Eteros' assertions regarding 21 U.S.C. § 863(f)(1), cursorily stating that CBP "maintains that 21 U.S.C. § 863(f)(1) does not provide an importer a means to enter drug paraphernalia." *Id.* CBP instructed Eteros that "under the authority of 19 C.F.R. § 151.16(j),"[1] the Subject Merchandise "is hereby excluded from entering the United States. In accordance with 19 U.S.C. § 1514, you have the right to protest CBP's decision to exclude." *Id.*

---

[1] 19 C.F.R § 151.16(j) provides:

(j) Seizure and forfeiture; denial of entry or exportation. If otherwise provided by law, detained merchandise may be seized and forfeited. In lieu of seizure and forfeiture, where authorized by law, Customs may deny entry and permit the merchandise to be exported, with the importer responsible for paying all expenses of exportation.

Eteros timely protested CBP's exclusion of the Subject Merchandise on or around May 11, 2021, and requested that CBP decide the protest pursuant to, *inter alia,* 19 C.F.R. § 1499(c) and 19 C.F.R. § 174.21(b), which require review and action by CBP "within 30 days from the date the protest was filed." *Id.* ("Any protest filed pursuant to this paragraph which is not allowed or denied in whole or in part before the 30th day after the day on which the protest was filed shall be treated as having been denied on such 30th day for purposes of 28 U.S.C. [§] 1581."). *See* Eteros' Protest Memo, Compl. Ex. A. CBP received the Protest and supporting documents on May 12, 2021.

The protest, and supporting materials submitted therewith, contended that the Subject Merchandise is used in the hemp and cannabis industry but is not an importation contrary to law under 19 U.S.C. § 1595a(c)(2), and is not prohibited "drug paraphernalia" under 21 U.S.C. § 863(a). *See e.g.,* Eteros' Protest Memo, Compl. Ex. A. Rather, it is subject to the <u>authorization exemption of 21 U.S.C. § 863(f)(1)</u>, which allows those "authorized by local, State, or Federal law" to engage in the otherwise prohibited conduct, including the importation of the Subject Merchandise. The Subject Merchandise was imported into the United States at the Port of Blaine, WA. Washington State is a State which has legalized hemp and marijuana and whose laws authorize Eteros to possess and use devices for the processing of cannabis, such as the Mobius M108S Trimmer. As a result of Washington State laws, and by application of 21 U.S.C. § 863(f)(1), CBP has no authority to exclude the Subject Merchandise.

**V.     Deemed Denial of Eteros' Protest By Operation of Law.**

Eteros' Protest was deemed denied pursuant to 19 C.F.R. § 174.21(b) on June 11, 2021— *i.e.,* "the 30th day after the day on which the protest was filed … " *Id.*

Plaintiff timely filed this action to challenge the denial of its protest on June 11, 2021.

## **STANDARD OF REVIEW**

Under Rule 12(c), "after the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Any party may move for judgment on the pleadings after the pleadings are closed and if it would not delay trial. A Rule 12(c) motion "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Herbert Abstract Co. v. Touchstone Properties, Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (citations omitted). A motion for judgment on the pleadings may be granted if the moving party is entitled to judgment as a matter of law. *NZ Lamb Co. v. United States,* 40 F.3d 377, 380 (Fed. Cir. 1994). "Judgment on the pleadings is appropriate where there are no material facts in dispute and the party is entitled to judgment as a matter of law." *Forest Labs., Inc. v. United States*, 476 F.3d 877, 881 (Fed. Cir. 2007) (citation omitted); *see also Universal Steel Prods. v. United States,* 495 F. Supp. 3d 1336, 1342 (Ct. Int'l Trade 2021). A ruling on a motion for judgment on the pleadings is reviewed under the same standard as a motion to dismiss under Federal Rule of Civil Procedure ("FRCP") l2(b) for failure to state a claim. *See GATX Leasing Corp. v. Nat'l Union Fire Ins.* Co., 64 F.3d 1112, 1114 (7th Cir. 1995).

## **ANALYSIS**

Unlike most protest cases commenced pursuant to 28 U.S.C. § 1581(a), this action does not seek a refund of duties paid. Rather it presents a critical legal question: whether CBP can decline to consider the authorization exemption carved out by Congress in 21 U.S.C. § 863(f)(1), which requires consideration of federal, state and local authorizations in determining the admissibility of goods meeting the federal definition of "drug paraphernalia," 21 U.S.C. § 863(d). More specifically, the question concerns the admissibility of Plaintiff's imported merchandise,

consisting of parts for the Mobius M108S Trimmer, an agricultural machine, under the laws of the United States. Congress has spoken on this issue in 21 U.S.C. § 863(f)(1) and CBP has no authority to decline to consider all portions of relevant laws of the United States, including their exemptions.

**I.     The Federal Authorization Exemption of 21 U.S.C. § 863(f)(1) is Plain and Unambiguous and Must Be Applied According to its Terms.**

Settled principles of statutory construction provide that this Court must first determine whether the statutory text is plain and unambiguous; and if it is, then the statute must be applied according to its terms. *See e.g., Dodd v. United States*, 545 U.S. 353, 259 (2005); *United States v. Gonzales*, 520 U.S. 1, 4 (1997); *Tyler v. Cain*, 533 U.S. 656, 663 (2001). Congress "says in a statute what it means and means in a statute what it says there[.]" *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254 (1992); *see also Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

The text of 21 U.S.C. § 863, and particularly subsection (f)(1), is plain and unambiguous. Merchandise imported into the United States in violation of the drug paraphernalia restrictions of the Mail Order Drug Paraphernalia Control Act of 1986, 21 U.S.C. § 863, can be excluded, and seized by CBP under authority of 19 U.S.C. § 1595a(c)(2)(A). *See* 21 U.S.C. § 863(a). The Mail Order Drug Paraphernalia Control Act makes it "unlawful for any person—

(1) to sell or offer for sale drug paraphernalia;

(2) to use the mails or any other facility of interstate commerce to transport drug paraphernalia; or

(3) to <u>import or export drug paraphernalia</u>.

*Id.* at § 863(a) (emphasis added). The federal definition of "drug paraphernalia" covers a seemingly limitless range of items used to prepare, conceal, and ingest controlled substances.[2] "Drug Paraphernalia" is defined as:

> … any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter. It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana, cocaine, hashish, hashish oil, PCP, methamphetamine, or amphetamines into the human body …

*Id.* at § 863(d). The Mail Order Drug Paraphernalia Control Act makes unlawful certain paraphernalia-related activities, including the importation of goods meeting the definition of "drug paraphernalia," *id.* at § 863(a)(3), but as discussed herein, these prohibitions are not absolute.

While Congress is actively contemplating changes to the CSA which would tax and regulate marijuana at the federal level in a manner similar to many States,[3] the current laws governing "drug paraphernalia" already provide that the Subject Merchandise—at least in this circumstance—is not prohibited from importation. This is because Congress enacted a statutory authorization exemption to the Mail Order Drug Paraphernalia Control Act at 21 U.S.C. § 863(f)(1), which removes the ban on importing drug paraphernalia when State or local law provide authorization. Indeed, subsection (f)(1) unequivocally requires consideration of local, state, and/or federal authorizations of the manufacture, possession, or distribution of merchandise meeting the federal definition of "drug paraphernalia," providing (emphasis added):

(f) Exemptions. This **section shall not apply to**—

---

[2] *See e.g.,* Controlled Substances Act ("CSA"), Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. No. 91-513, 84 Stat. 1236 (codified as amended at 21 U.S.C. §§ 801 *et seq.*).

[3] Several bills have been introduced to de-schedule and tax marijuana at the Federal level, including the MORE Act, H.R. 3884, 116th Cong. (2019); the Marijuana Freedom and Opportunity Act, S. 1552, 116th Cong. (2019); while others focus on much needed changes to the banking and tax laws, *see e.g.,* SAFE Banking Act of 2021, H.R. 1996, 117th Cong. (2021).

(1) **any person authorized by local, State, or Federal law** to manufacture, possess, or distribute such items.

This exemption makes all prohibitions of § 863(a) inapplicable to any "person authorized by local, state, or federal law to manufacture, possess, or distribute" drug paraphernalia.

The question before the Court is whether the phrase in 21 U.S.C. §863(f)(1) "[t]his **section** shall not apply to" means what it says—*i.e.,* that the entirety of section 863 shall not apply when a person is authorized under state law—or whether the phrase should be somehow limited, or wholly disregarded, as CBP contends. *See e.g.,* CBP Headquarters Ruling ("HQ") H306125 (August 5, 2020).

Courts "must presume that [the] legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank*, 503 U.S. at 253-254. What Congress has said in § 863(f)(1) is clear: a State can authorize the possession, manufacture, and distribution of drug paraphernalia; and where it does, the federal government cannot enforce 21 U.S.C. § 863(a)(3).

CBP's position, as set out in HQ H306125 (August 5, 2020) refuses to recognize subsection (f)(1) in any circumstance because, according to the agency "[i]n the context of 21 U.S.C. § 863, federal law does not 'authorize' the importation of drug paraphernalia under any circumstances." But this rationale only addresses the *authority of the federal government* to authorize otherwise prohibited conduct under the authorization exemption of § 863(f)(1)—and of course, Congress recognized that the federal government's declination to provide subsection (f)(1) authorizations does nothing to limit or curtail authorizations given by State or local laws. *See* 21 U.S.C. § 863(f)(1) (" … . any person authorized by **local**, **State**, or Federal law … ").

According to CBP's public position,[4] State legalization of cannabis and/or cannabis paraphernalia has no bearing on the authorization exemption of 21 U.S.C. § 863(f)(1):

> Although the possession and use of cannabis may be legal under some states' laws, 21 U.S.C. § 863 is a federal statute that prohibits the importation of drug paraphernalia. A core principle of American law is that the federal laws enacted by Congress constitute the supreme law of the land.  Specifically, the Supremacy Clause of the U.S. Constitution (Article VI, Clause 2) requires that, in the event of any conflict between state and federal law, federal law must be applied.

HQ H306125 (August 5, 2020). But as CBP knows, there is absolutely no conflict between State and federal law when the federal authorization exemption of § 863(f)(1) explicitly requires consideration of state laws, thus anticipating that one state may authorize conduct that remains prohibited in another state.

In HQ H306125 (August 5, 2020), CBP flagrantly rejects the clearly stated Congressional intent in § 863(f)(1), refusing to consider **local** or **State** authorization regimes:

> … 21 U.S.C. § 863(a) relates in part to the importation and exportation of drug paraphernalia, an area of paramount federal concern. By prohibiting the import of drug paraphernalia into the United States, Congress sought to protect all states from the problems associated with drug paraphernalia.  The current version of this provision was drafted broadly to provide a comprehensive prohibition on the importation of drug paraphernalia and the transportation of drug paraphernalia in interstate commerce.  <u>If a state could essentially exempt itself from this federal statutory regime, then importations of drug paraphernalia into that state could easily be transported to other states in which drug paraphernalia remains illegal.</u>  We decline to interpret 21 U.S.C. § 863(f)(1) in this way because doing so would deprive other states of the full protections afforded by federal law.

(Emphasis added). CBP fails to mention that 21 U.S.C. § 863(a)(1) or (2) provide authority for the federal government to enforce restrictions relating to "sell[ing] or offer[ing] for sale drug paraphernalia" in states in which drug paraphernalia remains illegal; or when "the mails or any other facility of interstate commerce" are used "to transport drug paraphernalia" to such

---

[4] CBP rulings represent the official position of CBP on the issue discussed and are binding on all CBP personnel. 19 C.F.R. § 177.9(a).

jurisdictions. Of course, disregarding state legalization regimes and the federal authorization exemption entirely and instead interdicting all imports of "drug paraphernalia" would make the prohibitions of § 863(a) easier to enforce. However, Congress struck a different balance and the import prohibitions of § 863(a)(3) offer absolutely no justification for CBP's concern that "drug paraphernalia could easily be transported to other states in which drug paraphernalia remains illegal." Congress' authorization exemption cannot be written out of the law and CBP has no authority to reject Congress' intent that States may, as they deem fit, authorize the possession, distribution or manufacture of certain drug paraphernalia.

The Tenth Amendment to the United States Constitution provides that "all powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The regulation of drug paraphernalia is neither delegated to the federal government by the Constitution, nor prohibited by it to the States. Quite the contrary: the <u>federal Congress itself has *required* recognition and application of state drug paraphernalia authorization regimes</u>. 21 U.S.C. § 863(f)(1). Thus, there is no possibility of "depriv[ing] other states of the full protections afforded by federal law," *see* HQ H306125 (August 5, 2020). The U.S. Supreme Court has long recognized the role of the States as *experimental laboratories for democracy* in the sense that Justice Brandeis articulated in his dissenting opinion in *New State Ice Co. v. Liebmann*, 285 U.S. 262, 310-11 (1932) (Brandeis, J., dissenting) (urging that the Court not impose federal constitutional restraints on the efforts of a State to "serve as a laboratory").[5] CBP is bound by these concepts of federalism which have been

---

[5] Justice Brandeis observed, in part (*id.*):

There are many men now living who were in the habit of using the age-old expression: "It is as impossible as flying." The discoveries in physical science, the triumphs in invention, attest the value of the process of trial and error. In large measure, these advances have been due to experimentation. … There must be power in the States and the Nation to remould, through

explicitly demanded by Congress in the authorization exemption of 21 U.S.C. § 863(f)(1). Under subsection (f)(1), a State remains free to seek whatever solution it chooses for the authorization of drug paraphernalia.

To this end, and despite the federal prohibition, nearly every state has legalized marijuana in one form or another, likely in response to the scientific community's robust recognition of the efficacy of cannabis and the overwhelming public support for legalization.[6] Responding to federal inaction on the subject, in 1996, voters in California and Arizona passed ballot initiative laws creating the nation's first legal medical marijuana regimes.[7] In 1998, Washington, Oregon and Alaska followed suit;[8] with Maine, Colorado, Nevada, Hawaii, and Montana following close behind.[9] Currently, a total of 36 states' voters or legislatures have fully legalized marijuana for

---

experimentation, our economic practices and institutions to meet changing social and economic needs. …

To stay experimentation in things social and economic is a grave responsibility. Denial of the right to experiment may be fraught with serious consequences to the Nation. It is one of the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.

*See also Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) ("Deference to state lawmaking 'allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'' *Bond v. United States*, 564 U.S. 211, 221 [] (2011)) (quoting *Gregory [v. Ashcroft*, 501 U.S. 452, 458 (1991)].").

[6] For instance, in 1995, both the American Medical Association and the American Public Health Association endorsed the medical use of marijuana. *See* 141 Cong. Rec. E1374-01 (daily ed. June 30, 1995) (statement of Rep. Solomon) (referencing an article in the Journal of the American Medical Association, advocating the use of marijuana for medical purposes); *see also*, 141 Cong. Rec. E2365 (daily ed. Dec. 14, 1995) (statement of Rep. Frank) (referencing a resolution passed by The American Public Health Association supporting the medical use of marijuana); *see also* 143 Cong. Rec. E194 (daily ed. Feb. 10, 1997) (statement of Rep. Frank) (referencing Jerome P. Kassirer, M.D., *Federal Foolishness and Marijuana*, New England Journal of Medicine, 336 New Eng. J. Med. 366 (1977)).

[7] *See e.g.,* California Proposition 215 (1996) (codified as The Compassionate Use Act of 1996, Cal. Health and Safety Code 11362.5 (2000)); *see also*, Arizona Proposition 200, codified as Drug Medicalization, Prevention, and Control Act of 1996, Ariz. Rev. Stat. 13-3412.01 (2004).

[8] *See e.g.,* Washington Initiative Measure No. 692, codified as Medical Use of Marijuana Act, Wash. Rev. Code Ann. Ch. 69.51A (2004); Oregon Measure 67, codified as Oregon Medical Marijuana Act, Or. Rev. Stat. 475.300-.346 (2003); Alaska Ballot Measure 8, codified as Medical Uses of Marijuana for Persons Suffering from Debilitating Medical Conditions Act, Alaska Stat. 17.37.010-.37.070 (2003).

[9] *See e.g.,* Maine Question 2, codified as Maine Medical Marijuana Act of 1998, Me. Rev. Stat. Ann. Tit. 15, 5821-A (2004); Amendment 20, Colo. Const. art. XVIII, § 16 (2013); Nev. Const., Art. 4, § 38, Nev. Rev. Stat.

medical purposes,[10] with an additional 6 states legalizing other forms of cannabis extracts for medical use.[11]

The legalization trend has continued beyond medical marijuana laws. In November 2013, Washington State and Colorado passed laws legalizing and taxing marijuana for adult recreational use.[12] An onslaught of states have since followed their lead. In 2021 alone, New York, Connecticut, Virginia, and New Mexico each passed bills to legalize recreational marijuana. Currently, a total of 19 states' voters or legislatures have passed legislation to license the growing, processing and sales of recreational marijuana,[13] all imposing steep excise taxes.[14]

CBP's interpretation of § 863(f)(1), as set out in HQ H306125 (August 5, 2020), and reflected in its treatment of the Subject Merchandise herein at issue, conflicts directly with the only natural reading of the statutory text. Congress clearly provided that the import prohibition is inapplicable when State authorization exists. Subsection (f)(1) therefore limits subsection (a)(3)'s

---

§§ 453A.010-453A.810 (2003); Haw. Rev. Stat. §§ 329-121-128 (2013); 2004 Mont. Voter Initiative 148, codified as 2004 Medical Marijuana Act, 2011 Mt. SB 423.

[10] *See e.g., State Medical Marijuana Laws,* National Conference of States Legislatures (Aug. 23, 2021), accessible at https://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx (last visited Sept. 9, 2021).

[11] *Id.*

[12] *See e.g.,* Initiative 502 ("I-502"); 2013 Wash. Laws. Ch. 3, § 20(3); *see also e.g.,* Wash. Rev. Code Ann. §§ 46.04.586, 46.04.5055, 46.20.308, 46.61.502-506 (2012); Wash. Rev. Code Ann. §§ 69.50.101-609 (2014); Wash. Admin. Code § 314-55-005-540 (2014); Amendment 64, Colo. Const. art. XVIII, § 16; *see also e.g.,* Colo. Const. art. XVIII, § 16 (2013); Colo. Rev. Stat. §§ 12-43.4-101-1101 (2014); Colo. Rev. Stat.§§ 18-3-106, 18-3-205 (2014); Colo. Rev. Stat. § 42-4-1301 (2014); 1 Colo. Admin. Code § 212-2.102-1401 (2014).

[13] In addition, 31 states have passed laws expressly decriminalizing recreational marijuana use. *See e.g., State Medical Marijuana Laws,* National Conference of States Legislatures (Aug. 23, 2021), https://www.ncsl.org/research/health/state-medical-marijuana-laws.aspx (last visited Sept. 9, 2021).

[14] In FY2020, States with operational recreational marijuana markets collected state-level excise taxes totaling more than $1.7 billion in FY 2020, , s*ee e.g.,* Nguyen, Jeremiah, *States Projected to Post Higher Marijuana Revenues in 2021,* the Tax Foundation (August 3, 2021), accessible at https://taxfoundation.org/states-projected-post-higher-marijuana-revenues-2021/ (last accessed Sept. 9, 2021), with Washington State being the top collector of marijuana tax revenue per capita ($61.52 per resident), and Nevada arriving in third place ($34.15 per resident). *Id.* All of this tax revenue is collected on sales of a plant, or its extracts, that can only be grown, harvested, processed, sold and/or consumed with the aid of merchandise meeting the federal definition of "drug paraphernalia." *See* 21 U.S.C. § 863(d).

import prohibition to circumstances where goods are imported into a State where no State or local law authorizes the possession, manufacture, or distribution of cannabis paraphernalia.

The law does not give CBP discretion to refuse to consider state and local laws and authorizations granted thereby. Stated another way, CBP has no authority to ignore or disregard 21 U.S.C. s863(f)(1). If CBP's interpretation of its own authority is correct, the exemptions Congress wrote into the drug paraphernalia law are wholly superfluous: once CBP determines that an importation consists of "drug paraphernalia," the agency would be free to exclude or seize/forfeit the merchandise without considering whether the applicable state law provides authorization for the importer's conduct. In effect, the agency would be given license to read 21 U.S.C. § 863(f)(1) out of the law entirely. Interpretation of a statute which render a statute, or any part of it, nugatory, are strongly disfavored and to be avoided if any other interpretation which avoids that result is available. *Akebia Therapeutics, Inc. v. Azar,* 976 F.3d 86, 96-97 (1st Cir. 2020). Statutes must be construed so as to avoid rendering superfluous any statutory language. *Bailey v. United States*, 516 U.S. 137, 146 (1995); *Hibbs v. Winn,* 542 U.S. 88 (2004) ("The rule against superfluities complements the principle that courts are to interpret the words of a statute in context."); *See also* 2A N. Singer, Statutes and Statutory Construction § 46.06, pp 181-186 (rev. 6th ed. 2000) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant … " (footnotes omitted)).

CBP's interpretation of 21 U.S.C. § 863(f)(1) runs directly counter to the rule against superfluities. Here, CBP refused to consider or apply subsection (f)(1) while excluding merchandise in Washington State. This, despite the State law clearly authorizing Eteros' possession, distribution and manufacture of cannabis paraphernalia. In its letter dated May 10,

2021, *see* Compl. Ex. A (Protest Ex. F) (hereinafter "CBP Exclusion Decision"), CBP refused to

recognize Congress' authorization exemption, nor the laws of Washington State, stating:

> … you stated that the merchandise entered on Entry 551/58788808 is authorized
> to enter the United States under the authority of 21 U.S.C. § 863(f)(1). CBP,
> however, maintains that 21 U.S.C. § 863(f)(1) does not provide an importer a means
> to enter drug paraphernalia. Therefore, under the authority of 19 C.F.R. § 151.16(j),
> the above referenced merchandise is hereby excluded from entering the United
> States.

*Id.* The agency's interpretation of § 863(f)(1) is woefully incorrect.

> ## A.    The Entirety of Section 863's Prohibitions "Shall Not Apply" When Subsection (f)(1) Authorization Exists.

Merchandise entered *in violation of* the drug paraphernalia restrictions of the Mail Order

Drug Paraphernalia Control Act can be seized by CBP under authority of 19 U.S.C.

§ 1595a(c)(2)(A), 21 U.S.C. § 863(a)(3), and excluded by application of 19 C.F.R. § 151.16(j)

(providing CBP authority to exclude rather than seize prohibited merchandise). However, 19

C.F.R. § 151.16(j) only authorizes the seizure, forfeiture, or exclusion of merchandise "if

otherwise provided by law." CBP's theory that the Subject Merchandise is *prohibited* from entry

would be correct if Congress did not include subsection (f)(1) in the Mail Order Drug

Paraphernalia Act of 1986, which states that the entirety of Section 863—including the import

prohibition of § 863(a)(3)—"**shall not apply**" to persons authorized by *inter alia* State law to

manufacture, possess, or distribute drug paraphernalia.

The word "**section**" has a clear meaning under the U.S. Code. First published in 1926, the

U.S. Code is the codification by subject matter of the general and permanent laws of the United

States. It is divided by broad subjects into titles published by the Office of the Law Revision

Counsel of the U.S. House of Representatives ("Office of the Law Revision Counsel"). *See e.g.,*

Office of the Law Revision Counsel, United States Code: Detailed Guide to the United States Code

Content and Features, available at https://uscode.house.gov/detailed_guide.xhtml (last accessed

August 19, 2021). According to the Office of the Law Revision Counsel:

> Each title of the Code is subdivided into a combination of smaller units such as subtitles, chapters, subchapters, parts, subparts, and sections, not necessarily in that order. Sections are often subdivided into a combination of smaller units such as subsections, paragraphs, subparagraphs, clauses, subclauses, and items.

*Id.* Here, 21 U.S.C. § 863 is found within Title 21 ("Food and Drugs"), at Chapter 13 ("Drug Abuse

Prevention and Control"), Subchapter I ("Control and Enforcement"), Part D ("Offenses and

Penalties"), Section 863 ("Drug Paraphernalia"). There can be no question that subsection (f)'s

use of the word "section" refers to the entirety of 21 U.S.C. § 863.

CBP selectively relies on 21 U.S.C. § 863(a)(3) enforcement authority, while pretending

the authorization exemption of subsection (f)(1) does not exist. This interpretation tramples on the

clear intent of Congress which requires consideration of state authorization regimes by law

enforcement officers acting under § 863(a) authority. Plaintiff's Subject Merchandise is not

imported *in violation* of the Act's proscription; it is imported lawfully under a federal authorization

exemption that relies on State legalization regimes which CBP refuses to recognize. CBP must be

reminded of its obligation to enforce all of Congress' laws, not merely those it agrees with.

### B. The Authorization Exemption Links Admissibility of Plaintiff's Merchandise to Authorizations Provided by *Inter Alia* State Laws.

Congress prescribed that the consequences for violating the import proscription of the Mail

Order Drug Paraphernalia Control Act would be inapplicable where the otherwise violative acts

occur in a State that has enacted laws legalizing, taxing, and/or regulating the use, possession, and

distribution of medical and recreational marijuana, and related paraphernalia, by specified persons.

The federal authorization exemption, 21 U.S.C. § 863(f)(1), makes clear that CBP has no authority

to seize or exclude imported "drug paraphernalia," as defined under § 863(d), as an importation

"contrary to law," *see* 19 U.S.C. § 1595a(c)—or as occurred here, to exclude under 19 C.F.R. § 151.16(j)—when State law authorizes the manufacture, possession, or distribution of such paraphernalia. Congress clearly empowered States to enact laws that take advantage of the 21 U.S.C. § 863(f)(1) authorization exemption so that all persons (whether individual or corporate) can be shielded from the consequences that may otherwise attach to violations of the Mail Order Drug Paraphernalia Control Act.

This makes a lot of sense. In passing the Mail Order Drug Paraphernalia Control Act, Congress was clear that the federal government would abstain from enforcing laws relating to "drug paraphernalia" when that conduct is authorized by *inter alia* State laws. Specifically, according to the Department of Justice Drug Paraphernalia Manual, this is "because [federal enforcement] was not thought to represent the most efficient or sensible allocation of federal drug enforcement resources." *See* U.S. Dep't of Justice, Drug Paraphernalia: Federal Prosecution Manual 1 (1991) ("DOJ Drug Paraphernalia Manual of 1991"), accessible at https://www.ncjrs.gov/pdffiles1/Digitization/134764NCJRS.pdf (last accessed March 20, 2021). Likewise, the 1980 House Select Committee on Narcotics issued a finding "that regulation of the paraphernalia industry can best be accomplished at the State and local government levels." *See e.g.*, Staff of H. Select Comm. on Narcotics Abuse & Control, 96th Cong., Rep. on Drug Paraphernalia, 17 (Comm. Print 1980).

Further support is found in the history of the federal government's failed prohibition of drug paraphernalia. The widely adopted Model Drug Paraphernalia Act, Drug Enforcement Agency (1979) ("Model Act") initially served as a guide to enable State legislatures to outlaw the possession, sale, manufacture, and advertisement of drug paraphernalia. *See United States v. Mishra*, 979 F.2d 301, 303 (3d Cir. 1992) (The Model Act was "adopted in some form in thirty-

eight states and the District of Columbia."). "While state laws patterned on the Model Act were largely effective in combatting intrastate sales," *see* 131 Cong. Rec. 5932·(Mar. 20, 1985) (Remarks of Rep. Levine), concerns about inconsistencies between (i) the federal prohibition of drugs, versus (ii) the lack of federal prohibition of drug paraphernalia led Congress to pass the Mail Order Drug Paraphernalia Control Act of 1986. *See* DOJ Drug Paraphernalia Manual of 1991, at 3. This legislation was patterned after the Model Act. *Id.* However, the 1986 Act went a step beyond the Model Act and "added an exemption provision for tobacco products[15] **and authorized individuals**." *Id.* at 4 (emphasis added). Congress thus reiterated that the federal government's prohibition of drug paraphernalia in 21 U.S.C. § 863(a) yields to the laws of the States when authorization is given. *See* 21 U.S.C. § 863(f)(1).

Moreover, considering that this case involves the exclusion of parts that will be assembled to create agricultural harvesting equipment, it is relevant to note that Congress, in enacting the Mail Order Drug Paraphernalia Control Act of 1986, deliberately removed language from the largely cannibalized Model Act which had captured merchandise within the statutory definition that was used in the growing and harvesting of cannabis; which strongly suggests that Congress never intended § 863(d) to capture within the definition of "drug paraphernalia" merchandise used in, *inter alia* farming, cultivating, and harvesting. Indeed, the DOJ Drug Paraphernalia Manual of 1991 states:

---

[15] To determine whether an item is intended for tobacco use or for use with a controlled substance, courts look to objective factors rather than a defendant's subjective intent. *See Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 520–21 (1994) ("An item's 'traditional' use is not based on the subjective intent of a particular defendant."). As defined by the Act, "drug paraphernalia" refers to any item "primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance." 21 U.S.C. § 863(d). Subsection (d) recites a brief list of items that fall within the definition, but an item may still be considered paraphernalia when "designed" or "primarily intended" for use with a controlled substance. *Id.* It is the intent of the manufacturer, rather than that of the retailer or buyer, that is relevant, *Posters 'N' Things, Ltd.*, 511 U.S. at 518, and no scienter requirement exists for parties other than manufacturers.

Although the <u>1986 Act retained much of the language of the Model Act, there are important differences</u>. The drug definition section of the 1986 Act is more restrictive in its reach. For example, **equipment used primarily for "planting, propagating, cultivating, growing, harvesting ... analyzing, packaging, [and] repackaging" are not expressly included in the 1986 Act's definition of drug paraphernalia**. Likewise, the first 11 specific examples of drug paraphernalia in the Model Act were omitted from the 1986 Act's definition of drug paraphernalia.

*Supra* at 3.

Despite the removal of "harvesting" equipment from the explicit federal definition of "drug paraphernalia," the federal definition remains preposterously broad.[16] For instance, merchandise imported by State-licensed cannabis farmers—whether tractors, pallets, office furniture, or printer paper—could easily be considered "equipment … primarily intended … for use in …producing" a (federally) "controlled substance." 21 U.S.C. § 863(d). Likewise, most state-licensing regimes impose requirements regarding enhanced security standards (*e.g.,* perimeter fencing, security cameras). If a licensed operator seeking to comply with State-licensing standards were to import security cameras or printer paper for generating invoices related to their cannabis paraphernalia business, what would stop CBP from detaining such products under § 863(a)(3)? Certainly this type of enforcement action is not what Congress intended.

Thus, while not expressly included in the 1986 Act, CBP contends that harvesting equipment is captured by the broad language of § 863(d). For purposes of this litigation, Plaintiff concedes that once fully assembled and in use by Plaintiff's customers, the Subject Merchandise—

---

[16] 21 U.S.C. § 863(d) provides:

The term "drug paraphernalia" means any equipment, product, or material of any kind which is primarily intended or designed for use in manufacturing, compounding, converting, concealing, producing, processing, preparing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance, possession of which is unlawful under this subchapter. It includes items primarily intended or designed for use in ingesting, inhaling, or otherwise introducing marijuana,[1] cocaine, hashish, hashish oil, PCP, methamphetamine, or amphetamines into the human body, such as—

23

certain motor frame assemblies to be assembled into the Mobius M108S—would meet the incredibly broad federal definition of "drug paraphernalia." *See* 21 U.S.C. § 863(d). The Subject Merchandise therefore constitutes "equipment … of any kind" which if *used by Plaintiff's customers* to harvest cannabis plant materials (plants which may exceed the CSA-threshold of 0.3% THC and would therefore be considered "marijuana" under federal law). In such cases, the customers' primary intended use of the Mobius M108S would likely implicate the merchandise as "drug paraphernalia" under § 863(d).

However, as discussed herein, whether the Subject Merchandise is "drug paraphernalia" is of no moment because § 863(f)(1) unequivocally provides an exemption and CBP lacks authority to exclude the Subject Merchandise.

**C.     CBP Lacks Authority to Exclude the Subject Merchandise.**

To qualify for the 21 U.S.C. § 863(f)(1) federal authorization exemption, the following factors must be satisfied:

(i)      the merchandise concerned must meet the § 863(d) definition of "drug paraphernalia";

(ii)     the interested party must be a "person" as that term is used in § 863(f);

(iii)    the person must be authorized by State, local or federal law to possess, distribute or manufacture the merchandise in question.

As detailed herein, Plaintiff satisfies each of these factors.

**1.     The Subject Merchandise Meets the Federal Definition of "Drug Paraphernalia"**

*See* discussion *supra*.

## 2.      Plaintiff is a "Person" as Envisioned by 21 U.S.C. § 863(f).

Congress' use of "person" in 21 U.S.C. § 863(f) unequivocally encompasses corporate persons. Corporate personhood is the legal notion that a corporation has at least some of the legal rights and responsibilities enjoyed by natural persons. As discussed, 21 U.S.C. § 863(f) exempts "persons" from all prohibitions of § 863 who are authorized by, *inter alia,* state law to possess, manufacture, or distribute paraphernalia.

The Dictionary Act, 1 U.S.C. § 1 provides a clear and affirmative answer to the question whether the corporate Plaintiff in this case is a "person" capable of qualifying for the authorization exemption of 21 U.S.C. § 863(f)(1). Originally enacted in 1871, the Dictionary Act instructs courts to apply federal statutory definitions of common statutory terms—*e.g.,* "person"—and basic rules of grammatical structure—*e.g.,* plural words include the singular—"unless context indicates otherwise." The Dictionary Act provides:

> In determining the meaning of any Act of Congress, unless the context indicates otherwise—
>
>       *          *                    *
>
> the words "person" and "whoever" include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals; ….

Thus, 21 U.S.C. § 863(f)'s reference to "person" includes corporate persons.

Two recent U.S. Supreme Court decisions have applied the Dictionary Act's rules on corporate personhood, extending constitutionally protected rights that were traditionally viewed as personal rights to corporate entities. In *Citizens United v. Federal Election Commission,* 558 U.S. 310 (2010), the Court held that political spending is a form of protected speech under the First Amendment. Because corporations are "persons," these First Amendment rights to free speech extend equally to persons and corporate entities. Meanwhile, in *Burwell v. Hobby Lobby Stores,*

*Inc.*, 573 U.S. 682 (2014), the Court interpreted whether closely-held corporations are "persons" under the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C § 2000bb *et seq*., which provides that the Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability. As the RFRA does not define the term "person," the Court applied the Dictionary Act's definition of "person," holding that the free exercise right of the closely-held corporation protects the religious rights of the people who formed the corporation. The Court explained:

> Under the Dictionary Act, "the wor[d] 'person' … include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." [1 U.S.C. § 1]; *see FCC v. AT&T Inc*., 562 U.S. 397, 404, 405, 131 S. Ct. 1177, 1183, 179 L. Ed. 2d 132, 139 (2011) ("We have no doubt that 'person,' in a legal setting, often refers to artificial entities. The Dictionary Act makes that clear"). Thus, unless there is something about the RFRA context that "indicates otherwise," the Dictionary Act provides a quick, clear, and affirmative answer to the question whether the companies involved in these cases may be heard.
>
> We see nothing in RFRA that suggests a congressional intent to depart from the Dictionary Act definition …

573 U.S. at 707-08.[17] Likewise, here, the Court will find nothing in the Mail Order Drug Paraphernalia Act that suggests a congressional intent to depart from the Dictionary Act definition of "person." Accordingly, the term "person" encompasses corporate persons.

While States generally do not include an equivalent to the federal "Dictionary Act," most have adopted statutes that are functionally similar which govern the construction of commonly used statutory terms; and the term "person" is often explicitly defined to include all forms of

---

[17] As the Court relied on the Dictionary Act definition of "person," the *Burwell* Court concluded that closely held for-profit corporations fall under RFRA's reference to "person," and therefore, "a federal regulation's restriction on the activities of a for-profit closely-held corporation must comply with RFRA." *Id.* at 719.

corporate entities. Indeed, the Washington Business Corporation Act,[18] and Nevada State law,[19] expressly define the term "person" to include corporate persons.

Accordingly, there should be no question that the term "person" as it is used in 21 U.S.C. § 863(f) is intended to cover individual and corporate persons.

 3. **Plaintiff is Authorized by State Law to Possess, Distribute or Manufacture the Subject Merchandise**

  a. **The Laws and Regulations of the State of Importation Govern Application of 21 U.S.C. § 863(f)(1)'s Authorization Exemption.**

CBP has asserted the power to exclude the Subject Merchandise in the State of Washington under the import prohibitions of 21 U.S.C. § 863(a)(3). However, the import prohibition only empowers CBP to exclude or seize if the authorization exemption does not apply. Where an authorization exemption attaches to the importer's conduct in the State of importation, as here, CBP lacks authority to exclude or seize the imported merchandise.

The Federal Government would remain free to use its authority under 21 U.S.C. § 863(a)(1) or (2) to enforce restrictions relating to "sell[ing] or offer[ing] for sale drug paraphernalia" if violative goods arrive in states where paraphernalia is not authorized; or when "the mails or any

---

[18] Wash. Rev. Code Ann. § 1.16.080 ("'Person'—Construction of 'association,' 'unincorporated association,' and 'person, firm, or corporation' to include a limited liability company"), provides:

(1) The term "person" may be construed to include the United States, this state, or any state or territory, or any public or private corporation or limited liability company, as well as an individual.

(2) Unless the context clearly indicates otherwise, the terms "association," "unincorporated association," and "person, firm, or corporation" or substantially identical terms shall, without limiting the application of any term to any other type of legal entity, be construed to include a limited liability company.

[19] Nev. Rev. Stat. § 0.039 ("'Person' defined"), provides:

Except as otherwise expressly provided in a particular statute or required by the context, "person" means a natural person, any form of business or social organization and any other nongovernmental legal entity including, but not limited to, a corporation, partnership, association, trust or unincorporated organization. The term does not include a government, governmental agency or political subdivision of a government.

other facility of interstate commerce" are used "to transport drug paraphernalia." However, the import prohibitions of 21 U.S.C. § 863(a)(3) offer no justification for CBP's concern, expressed in HQ H306125 (August 5, 2020) that "drug paraphernalia could easily be transported to other states in which drug paraphernalia remains illegal." 21 U.S.C. § 863(f)(1) applies to the facts and circumstances existing at the time CBP acts; and where CBP acts to exclude or seize goods in a State that has authorized the manufacture, possession or distribution of "drug paraphernalia," its actions are *ultra vires* and must be held unlawful.

### b.    Plaintiff's Conduct is Authorized by Washington State Law.

The Subject Merchandise is exempt from the import prohibitions of 21 U.S.C. § 863(a)(3) because the laws in the State where the Subject Merchandise was imported and is currently detained—Washington State—clearly authorize the possession, distribution, and manufacture of cannabis paraphernalia. Washington State authorizing laws also neuter CBP's power to enforce the import prohibition contained at § 863(a)(3), thus nullifying the federal prohibition on importing cannabis paraphernalia, and attaching consequences. This eliminates any claim that the Subject Merchandise is an importation "contrary to law" under 19 U.S.C. § 1595a(c).[20]

Indeed, Washington State legalized the recreational use of marijuana in 2012 when its citizens voted to pass of Initiative 502, 2013 Wash. Laws. ch. 3, § 20(3) ("I-502"). Per the Revised Code of Washington, a person in the State of Washington violates the drug paraphernalia laws if they use, deliver, or possess any "equipment, products, [or] materials of any kind" to "plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce

---

[20] Merchandise may be seized and forfeited, excluded from entry, or subjected to other sanctions, if *inter alia* "its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute[.]" 19 U.S.C. § 1595a(c)(2)(A).

into the human body a controlled substance **other than marijuana**." Wash. Rev. Code Ann. § 69.50.412 (emphasis added); *see also* Wash. Admin. Code § 314-55-010 (excluding from the definition of "paraphernalia" all "items for growing, cultivating, and processing marijuana[.]").[21] The Washington State Liquor and Cannabis Board ("WSLCB") regulates Washington's cannabis market, creating and enforcing rules regarding marijuana.[22] Accordingly, under Washington State law, the possession, manufacture, or distribution of marijuana-related "equipment, products, and materials of any kind" is authorized.

By application of 21 U.S.C. § 863(f)(1), there is no restriction or prohibition on the importation of cannabis paraphernalia into Washington State. CBP cannot enforce the § 863(a)(3) import prohibition because the § 863(f)(1) exemption removes all prohibitions on "drug paraphernalia" included in "the section"—*i.e.*, the entirety of 21 U.S.C § 863, including the import prohibition of § 863(a)(3)—for those authorized by local, state, or federal law to manufacture, possess, or distribute "drug paraphernalia."

CBP's refusal to consider or apply Washington State law as required by 21 U.S.C. § 863(f)(1) is unlawful, as is its denial of Plaintiff's protest.

## CONCLUSION

CBP's exclusion of the Subject Merchandise is unlawful and disregards the clear intent of Congress which seeks to recognize State laws governing merchandise meeting the federal definition of "drug paraphernalia." *See* 21 U.S.C. § 863(d). Defendant wrongfully excluded the Subject Merchandise from entry. The deemed denial of Eteros' Protest is unlawful.

---

[21] *See also e.g.,* Wash. Rev. Code Ann. §§ 46.04.586, 46.04.5055, 46.20.308, 46.61.502-506; Wash. Rev. Code Ann. §§ 69.50.101-609; Wash. Admin. Code § 314-55-005-540.

[22] *See e.g.,* Wash. Rev. Code Ann. § 69.50.342.

Respectfully submitted,

NEVILLE PETERSON LLP

/s/ Richard F. O'Neill
Richard F. O'Neill
701 Fifth Ave. Ste. 4200-2159
Seattle, WA 98104
(206) 518-9335
roneill@npwny.com

/s/ John M. Peterson
John M. Peterson
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated:  September 10, 2021

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. GARY S. KATZMANN**

------------------------------------------------------------------X

ETEROS TECHNOLOGIES USA, INC.       :

                                    :

          Plaintiff,           :

                                      :

          *v.*                   :          **No. 21-cv-00287**

                                      :

UNITED STATES,                  :

                                      :

          Defendant.        :

------------------------------------------------------------------X

<u>**CERTIFICATE OF COMPLIANCE**</u>

        Pursuant to the U.S. Court of International Trade Standard Chambers Procedures, and in reliance upon the word count feature of the word processing program used to prepare the instant Memorandum, I, Richard F. O'Neill, of Neville Peterson LLP, who is responsible for the instant Memorandum, certify that it contains 9,984 words.

                                        Respectfully submitted,

                                        /s/ Richard F. O'Neill
                                          Richard F. O'Neill

1